UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| DENNY DENSMORE,<br><br>  Plaintiff,<br><br>  v.<br><br>NATIONAL BOARD OF MEDICAL EXAMINERS,<br><br>  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:15-CV-0096-JL<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S PRETRIAL MEMORANDUM OF LAW

Pursuant to Local Rule 16.2(b)(2) and the Court's September 16, 2015 Trial Notice, defendant National Board of Medical Examiners ("NBME") submits its Pretrial Memorandum of Law.

## I.    Introduction

Plaintiff Denny Densmore is a former medical student.  Eight years after starting medical school at the Medical School of South Carolina ("MUSC"), Densmore was dismissed from the School based on his failure to pass the United States Medical Licensing Examination ("USMLE") and his failure to demonstrate any urgency in his efforts to do so.

Densmore claims that his failure to pass the Step 2 CK (Clinical Knowledge) and Step 2 CS (Clinical Skills) portions of USMLE resulted from the failure of NBME to provide him with an accommodation namely, twice as much testing time as is given to other examinees to complete it.  He asserts that he is disabled and thus entitled to accommodation under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.*

NBME is a not-for-profit organization that together with the Federation of State Medical Boards develops and provides for the administration of the USMLE, a standardized examination consisting of three "Steps" and used by the state medical licensing authorities as part of the requirements for licensing physicians in the United States.  Only the Step 2 CK and Step 2 CS are at issue in this case.

As a private entity that offers examinations related to licensing for medical professionals, NBME concedes that it must comply with Section 12189 of the ADA, which requires testing entities to "offer such examinations . . . in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."  42 U.S.C. § 12189.  Testing entities must insure that "persons who qualify as disabled under the Americans with Disabilities Act receive reasonable accommodations during test-taking."  *Scheibe v. Nat'l Bd. of Med. Exam'rs*, 424 F. Supp.2d 1140, 1143 (W.D. Wis. 2006).  At the same time, to protect the integrity of test scores and the public's interest in the medical licensure process, NBME must also insure that "no candidate or group of candidates receives an unfair advantage in the administration of the exam."  *Id* at 1142.  *See also Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 88-89 (2d Cir. 2004) ("[NBME's accommodation] procedures are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination.  As administrator of the national exam used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it."), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004).

In order to establish that he is entitled to accommodations under the ADA, Densmore must show that he has "a physical or mental impairment that substantially limits one or more major life activities[.]"  42 U.S.C. § 12102(1).  Thus, in seeking accommodations from the NBME, Densmore was required to provide information documenting that (1) he suffers from a physical or mental impairment; (2) the impairment affects one or more major life activities; and (3) the impairment "substantially limits" the alleged major life activity.  But not every impairment qualifies as a disability under the ADA.  Rather, an "impairment is a disability under the ADA only . . . if it substantially limits the ability of an individual to perform a major life activity as compared to *most people in the general population*."  28 C.F.R. 36.105(d)(v) (eff. Oct. 11, 2016) (emphasis added); *see also*, 29 C.F.R. § 1630.2(j)(1)(ii).  That distinction is at the heart of this case, and is the reason why Densmore was not entitled to an accommodation from NBME, even if one credits the differing diagnoses that he received from the evaluators who he consulted in order to obtain documentation in support of his request for accommodations on the Step 2 exams.[1]

Densmore first requested accommodation from NBME for the Step 2 CK exam in June 2008.  In August 2008, the NBME advised him that the information submitted demonstrated average range reading, writing, and mathematics skills and did not demonstrate a substantial limitation compared to most people.  NBME offered Densmore the option to take the exam under the standard conditions or provide additional supporting documentation.  Between November 13, 2008 and January 13, 2009, Densmore submitted various additional documents and had a number of telephone conversations with NBME Disability Services regarding his intent to supply additional documents.  Densmore's eligibility to take Step 2 CK expired on January 31, 2009, at

---

[1] NBME does not diagnose disabilities.  Instead, its role is to decide whether an applicant for accommodations has provided information and documentation sufficient to establish that he or she is in fact disabled and substantially impaired within the meaning of the ADA.

which time his request for test accommodations was still pending receipt of additional documents.  After his registration expired, Densmore was notified by letter dated February 18, 2009 that his 2008 request for test accommodations for Step 2 CK was closed and that he could submit a future request.

Densmore submitted a request for the same accommodation, double testing time, for Step 2 CK on December 19, 2012 and submitted a request for double testing time to write the patient notes for Step 2 CS on January 15, 2013.  These requests were denied in March 2013 based on the fact that the data submitted by him did not "demonstrate impairments that limit a major life activity relative to most people" because his performances on measures of academic achievement tasks demonstrated average, or above average range skills against that cohort.  In addition, the information submitted did not provide objective evidence of impaired functioning due to Attention-Deficit/Hyperactivity Disorder ("ADHD").

Put simply, Densmore has never provided information establishing that the disabilities he claims to have (a reading disorder, a writing disorder, a mathematics disorder, and ADHD) impair him relative to most people.  Instead, he filed this lawsuit based on a claim that he is substantially impaired relative to other medical students.  The evidence at trial will establish that even assuming Densmore is impaired (a fact that is not established by his documentation), based on the tests administered by his psychologists and historical records of his functioning that he submitted to NBME, he has performed either above average or at the level of his age-based peers and failed to demonstrate impaired functioning.  Thus, he has not established that he is substantially limited relative to most people in the general population.  If performing below average in comparison to other medical students was the standard for establishing

accommodations under the ADA, every below average student in medical school would be disabled and entitled to accommodations.  That is not the law.[2]

## II.   <u>Factual Background</u>

### A.   **Densmore's Request For Accommodations On USMLE**

In the Fall of 2006, Densmore successfully took and passed Step 1 of the USMLE without asking for or receiving any accommodations.  In December 2007, he failed Step 2 CK. On June 6, 2008, Densmore submitted a request for accommodations for the Step 2 CK based on three learning disabilities:  reading, writing, and mathematics.  NBME did not deny this request. Instead, it treated the application as incomplete and in August 2008 wrote to Densmore suggesting that he provide additional supporting information.[3]  NBME suggested that Densmore provide evidence of his past performance on standardized tests, his history of accommodations in school, and asked that his evaluator resubmit the results of his 2008 diagnostic tests of achievement reporting his performance against age-based peers, rather than the grade-based scores originally provided, since Densmore was forty years of age at the time the tests were administered.  Densmore provided some—but not all—of the information in late 2008 and early 2009.  By then, however, his eligibility period for Step 2 CK had expired (on January 31, 2009), and NBME notified Densmore that his accommodation request file was therefore closed.  On March 4, 2009, he took and failed the Step 2 CS.

---

[2] When he filed this lawsuit, Densmore claimed that he was disabled relative to other medical students.  After NBME moved to dismiss for failure to state a claim, he amended his complaint to allege the correct standard of a substantial limitation relative to most people in the general population.  But he continues to attempt to muddy the correct standard by alleging that a "learning disability substantially limits him in the major life activities of reading and learning, in comparison to most people *such as other medical students taking the Step 2 Exams*."  2d. Am. Compl., ¶ 27 (emphasis added).  And nearly all of the tests he submitted to NBME are based on a comparison to grade-based peers – *i.e.*, college graduates or medical students.  "Most people" do not fall within that cohort.

[3] NBME originally acknowledged his request on June 11, 2008, and reminded Densmore that his request would be processed when he registered for the Step 2 CK.

On November 30, 2009, Densmore submitted his SAT scores (which NBME had requested in 2008) and Armed Services Vocational Aptitude Battery ("ASVAB") scores. In response, NBME explained to him again that his file had been closed in February 2009 and that he needed to register for the exam and submit a new request to Disability Services within the first three weeks of his new testing eligibility period. Densmore did not do so. He retook Step 2 CK and Step 2 CS in September 2010 without submitting a request for accommodations and failed both exams.

Densmore did not submit a completed request for accommodations until December 19, 2012 (for the Step 2 CK) and January 15, 2013 (for the Step 2 CS). He asserted that he had been diagnosed with ADHD in 2010, as well as reading, writing, and mathematics disorders diagnosed in 2006 and 2008. NBME denied these requests for accommodations on March 20, 2013, finding that Densmore had not demonstrated that he was disabled within the meaning of the ADA or that the requested testing accommodations were appropriate modifications of the USMLE Step 2 CK and Step 2 CS. Specifically, Dr. Catherine Farmer, Director of NBME's Disability Services and ADA Compliance Officer, informed Densmore that the materials he submitted showed that he had at least average range reading and writing skills compared to his age-based peers, and that this did not demonstrate impairments that limit a major life activity relative to most people. Dr. Farmer further noted that one would expect individuals with developmental reading and writing disorders to present a long history of academic difficulties, which she noted was missing from his submission and contradicted by his report that he had no trouble learning to read; his successful military career; and average range performances on timed tests such as the SAT.

Dr. Farmer noted that ADHD also has a childhood onset and therefore typically results in a pervasive pattern of functional impairment in more than one domain such as school, work and social/personal areas.  Outlining his academic and work history, Dr. Farmer stated that there is no record showing he has a history of pervasive problems managing demands for attention or executive functioning.

Densmore retook the Step 2 CK and CS in April 2013 and failed both exams.

**B.      Densmore's Educational and Employment Background**

As noted above, Densmore sought accommodations on the Step 2 exams based on claimed reading, writing, and mathematics disorders, as well as ADHD.  As discussed in Part III below (and as explained by NBME in the reasons for its 2013 denial), expert testimony will show that learning disorders typically manifest at an early age when one is acquiring such skills. ADHD is also a neurodevelopmental disorder that first manifests in childhood and even if not diagnosed, typically results in a chronic and pervasive pattern of functional impairment.  ADHD and learning disorders also affect a broad range of activities in a person's life—not just standardized tests or the USMLE.  Densmore's documented educational and employment histories are not consistent with the histories of individuals who suffer from these disorders.

Densmore is 50 years old.  He grew up in South Carolina and currently resides in New Hampshire.  He attended high school through 11th grade, dropping out during his Senior year in 1984.  Densmore worked several different jobs while in high school and for several years thereafter, including plumbing, tailoring, and as a ballroom dancing instructor.  He later took and passed the GED, a standardized, timed examination, and in 1985, the State of South Carolina issued a Certificate of Equivalency.

In 1986, Densmore enlisted in the United States Navy.  As part of the enlistment process, he took the ASVAB without accommodations.  The ASVAB consisted of 11 subtests, each of

which was timed and included subtests in Word Knowledge and Paragraph Comprehension. Densmore tested at least within the average range compared to his age-based peers on every subtest.

Densmore received favorable performance reviews throughout his Navy career. His superiors repeatedly noted that he "always completes all tasks in a very timely and high level fashion" and he was "strongly recommended for advancement and retention" each year. His 1990 performance review noted that he was "well read" and he "relentlessly pursued higher education." In 1990, while in the Navy, Densmore took the Scholastic Aptitude Test (SAT), a standardized, timed test. He did not seek accommodations, and his verbal and math scores were above the national average.

In 1990, Densmore left active duty service, and enrolled at Greenville Technical College in South Carolina. He received an Associate in Arts degree, with a concentration in psychology and sociology, and an Associates in Science degree, with a concentration in physics and chemistry, in 1995, graduating with a cumulative GPA of 3.12. He received no formal accommodations at Greenville Tech, but reported he was sometimes given extra time if requested.

Densmore then enrolled at the University of South Carolina Spartanburg ("USC") in 1996 as an undergraduate. He was awarded a Bachelor of Science degree in August 2001, with a major in biology and a cognate in chemistry. He graduated with a 2.83 GPA and made the Dean's List his first semester. Again, he did not request or receive formal accommodations for a learning disorder or any other disability, but reportedly requested and usually received extra time to take examinations "when [he] needed it."

From 1992 to 2000 while attending college, Densmore worked for General Electric as a turbine assembly and airfoil quality control technician.  He did not request any accommodations while so employed.  His supervisors generally rated his work as satisfactory, praising him for his "close attention to detail," for completing in-process audits in a timely manner and for taking pride "in exactness on any assigned job."

Just prior to starting medical school at St. George's University in Grenada, Densmore enlisted in the Army National Guard and maintained an "on hold" status while in school.[4]  After he returned to the United States from medical school in Grenada, he became a NCO Mental Health Specialist in the Vermont Army National Guard ("VTARNG").  The VTARNG described Densmore's duties thusly:  "Collects and records psychosocial and physical data and assists with direct treatment of psychiatric, drug and alcohol patients, with the management of psychiatric in/out-patient settings, counsel clients/patients with personal, behavioral or psychological problems and assists with management of mental health facility."

In 2005, Densmore reported to the VTARNG that he had never seen a psychologist, social worker, counselor or other professional for any reason, "including counseling or treatment for school."  Further, his VTARNG health records from 2011 state that he had "[n]o educational handicap or barriers to learning."  He received an honorable discharge from the VTARNG in 2013.

Since leaving medical school in 2008, Densmore has been unemployed (apart from his VTARG duties), describing himself as mostly a "househusband" who is engaged in some subsistence farming.

---

[4] Densmore's medical school history is set forth in the following section.

### C.    Densmore's Medical School Performance

Densmore began applying to medical schools in 2001.  As part of the application process, he took the Medical College Admission Test ("MCAT"), a standardized, timed examination required for admission to medical school. He first took the MCAT in 1996 (while in college) and scored above average on the Verbal Reasoning section.  He took the MCAT again in 2002, scoring in the average range and well enough to gain admission to three Caribbean medical schools.  He did not seek or receive any testing accommodation on the MCAT.

Densmore matriculated at St. George's School of Medicine in January 2003 in Grenada. Although he withdrew from four classes during his time at St. George's, he received Bs and Cs in the classes he did complete.  When he left St. George's after four terms to attend MUSC, he was ranked number 321 out of 337 students.

Densmore transferred from St. George's to MUSC in 2005.  That transfer was contingent upon him repeating his second year of medical school, thus making him eligible for graduation in 2008.  As Densmore was undoubtedly aware, in order to be eligible to take the USMLE Step 1 and Step 2 exams, you must be enrolled in or a graduate of a medical school.

Densmore's medical school career at MUSC was not without its problems.  He testified in his deposition that he did not attend classes, feeling that attendance was "counterproductive" and "wasted [his] time."

In June 2006, after experiencing problems in passing a pathology exam, he "self-referred" to the Counseling and Psychological Services ("CAPS") at MUSC in order to obtain accommodations on his exams.  At that time, Alice Libet, Ph. D. recommended that Densmore receive "extended time to complete tests during medical school."  He was also seen by Dr. Libet for "depression and academic problems."  Dr. Libet diagnosed Densmore with "Depressive

Disorder NOS, as well as academic problems and a reading disorder." She recommended

evaluation for medications that would be "helpful for managing depression," but Densmore

declined the offer out of concern that having a record of taking medication for depression would

jeopardize his military career. Densmore informed Dr. Libet that he was already taking

medication (Lexapro) for depression. He admitted he had no prescription for Lexapro, but was

receiving samples from a friend who was a physician (a pediatrician) and who, according to

Dr. Libet's notes, "obtains medication from his own supply (presumably samples) and is not

maintaining a chart on Densmore."

In November 2006, Densmore was recommended for dismissal by the MUSC

Professional Standards Committee following an incident in which he apparently treated a nurse

in an unprofessional manner. Thereafter, Densmore was again treated by Dr. Libet. The MUSC

Committee eventually agreed to allow him to stay at the School on the condition that he receive

continued counseling and treatment, which Dr. Libet provided through late May 2007.

Throughout this process, Densmore contended that he was being "railroaded" and was a "victim

or scapegoat" and apparently expressed those views in writing to the Committee. Despite advice

from Dr. Libet to withdraw these statements and "to look more objectively at his own

contribution to the situation," he did not do so.

Dr. Libet's diagnosis of Densmore during this period was "Depressive Disorder

NOS…Academic Problem…Reading Disorder…[and] Narcissistic Personality Disorder." He

also reportedly suffered from back pain and tinnitus. Dr. Libet consistently recommended that

Densmore would benefit from "ongoing treatment for depression." While she wrote a letter to

the Professional Standards Committee on Densmore's behalf, she did not testify and "expressed

[her] grave concern" that it would not be helpful for her to do so because of his practice of

"obtaining sample medications through a physician friend, and his taking those medications at less than the prescribed dose."

MUSC required passage of Step 2 in order to graduate.  Because Densmore failed the Step 2 CK in 2007, he did not graduate with his class in 2008.  He took the Step 2 CS and CK exams again in 2010 but failed them.

In July 2011, the Associate Dean of MUSC wrote to Densmore (who had moved to New Hampshire in 2008) to inform him of the School's "Medical Degree Completion policy."  The Dean informed Densmore that the School required students to complete their degree within six years of matriculation or face dismissal.  The letter informed Densmore that if he did not "take and pass Step 2 CK by December 31, 2011" he would be "referred to the Progress Committee." Despite the Associate Dean's warning, Densmore did not take the test in 2011.  On January 5, 2012, the Progress Committee met and decided to recommend to the Dean that Densmore be dismissed.

In February 2012, following a hearing before the Student Progress Committee at which Densmore appeared, the Committee formally recommended to the Dean that he be dismissed. The Committee notes contain a "Timeline" of Densmore's time at MUSC and of his efforts to pass the USMLE Step 2 exams.  The Committee noted that Densmore had reported that he had not made any attempt to take the Step 2 CK in 2008, 2009 or 2011 and that he "reported that the majority of his time was spent researching court cases related to the NBME not granting accommodations."  Densmore also reported to the Committee (inaccurately) that he had been "initially denied" accommodations in 2008 and (accurately) that from 2009 to 2012, "he did not contact the NBME to make another request for accommodation."

The Committee also expressed concern that Densmore's representations to the Committee were inconsistent.  In the February 2012 hearing, Densmore represented that he had not completed another psychological evaluation since 2006 and he was apparently asked "several times about his reasoning for not completing" such an evaluation.  Densmore told the Committee that he could not afford to do so.  But a Committee member pointed out that Densmore had informed the Committee "in a January 2011 email that he had completed an additional comprehensive psychological evaluation."  (Emphasis in original).  In fact, Densmore had been evaluated both in 2008 and in 2010 (see discussion below in Part III.B.).  In its report recommending dismissal, the Committee noted that Densmore "did not appear to have prioritized completing the requirement [Step 2] after an extensive period of time."  Densmore appealed this decision to the Dean of MUSC.

On April 25, 2012, Dean Etta Pisano, Vice President for Medical Affairs and Dean of the College of Medicine, wrote to Densmore, giving him "one more opportunity to successfully pass [his] USMLE Step 2CK and Step 2CS exams," with a "non-negotiable" deadline of April 30, 2013.  Dr. Pisano informed Densmore that he had "been provided with many opportunities to succeed during the course of [his] time at MUSC" and that if he did not meet the deadline, she would uphold the Committee's dismissal.

Despite being informed of this deadline in April 2012, Densmore did not request accommodations from NBME until late December 2012 and January 2013.  NBME denied the request in March of 2013.  Densmore finally took Step 2 CK on April 18, 2013 and Step 2 CS on April 16, 2013, less than two weeks before the deadline given by Dr. Pisano one year earlier.  He failed both exams.

In May 2013, Dr. Pisano informed Densmore that she was recommending his dismissal, again noting that he had "been provided with every opportunity to succeed."

On June 19, 2013, Densmore wrote to the President of MUSC contending that he had been "repeatedly denied" reasonable accommodations by NBME and requesting reinstatement. He advised the President that he had retained an attorney who would "soon forward a recent medical report from his own expert psychologist who concurs with the many other experts who have tested me." No such report was produced to MUSC or in discovery in this case. Then, in July 2013, Densmore wrote the Vice President of Academic Affairs for MUSC requesting reinstatement and expressing his view that a "tiny cabal of poisonous detractors at [MUSC] will try to muddy the waters."

On July 12, 2013, Mark Sothman, Ph.D., the Vice President of Academic Affairs and Vice-Provost of MUSC, upheld Densmore's dismissal "on several accounts." First, he found that MUSC policies had provided Densmore with due process in his dismissal. Second, he concluded that Densmore's failure to obtain a degree despite the passage of eight years since his matriculation justified dismissal. Third, he noted that Densmore made no attempt to take the USMLE in 2011 and 2012 and that he "did not see evidence of urgency in [Densmore's] attempt to resolve the issues….regarding NBME." As a result, even if this Court were to find that Densmore was entitled to an accommodation on the USMLE, it is unclear whether Densmore would be readmitted to MUSC. Densmore must be enrolled in medical school to be eligible to take the USMLE. Thus, it is unlikely that this Court can award any meaningful relief.

III.   <u>Argument</u>

   A.   **Applicable Law Under The ADA**

   Title III of the Americans With Disabilities Act provides that:

> Any person that offers examinations or courses related to
> applications, licensing, certification, or credentialing for secondary
> or post-secondary education, professional, or trade purposes shall
> offer such examinations or courses in a place and manner
> accessible to persons with disabilities or offer alternative
> accessible arrangements for such individuals.

42 U.S.C. § 12189.  NBME agrees that it is subject to the requirements of Section 12189 but

disputes that Densmore is disabled within the meaning of the ADA.

   The ADA defines "disability," in pertinent part, as "a physical or mental impairment that

substantially limits one or more major life activities[.]"  42 U.S.C. § 12102(1).  Courts apply "a

three-part analysis to determine whether an impairment qualifies as a disability under the ADA."

*Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 187 (1st Cir. 2011).  "First, the plaintiff must

establish that he suffers from a physical or mental impairment."  *Id.*  "Second, he must

demonstrate that it affects life activities that are 'major,' *i.e.,* 'of central importance to daily

life.'"  *Id.*, quoting *Carroll v. Xerox Corp.*, 294 F.3d 231, 238 (1st Cir. 2002).  "Finally, he must

show that the impairment 'substantially limits' the identified major life activity."  *Id.*

   1.   **Mental Impairment**

   Under the recently revised regulations that implement Title III of the ADA,  "mental

impairment" is defined as "[a]ny mental or psychological disorder, such as an intellectual

disability, organic brain syndrome, emotional or mental illness and specific learning disabilities."

28 C.F.R. § 36.105(b)(1)(ii).[5]  Mental impairments include, among other things, "specific

---

[5] On August 11, 2016, the Department of Justice issued a final rule, which becomes effective on October 11, 2016, amending its ADA regulations in order to incorporate the statutory changes to the ADA set forth in the ADA Amendments Act of 2008.  The DOJ also added new sections to its title II and title III ADA regulations to set forth

learning disabilities" and "Attention Deficit Hyperactivity Disorder."  *Id.* at § 36.105(b)(2).

However, "not every impairment will constitute a disability" with the meaning of ADA.  *Id.* at

§ 36.105(d)(v).[6]  "An impairment and disability are two different things," therefore, the fact that

a plaintiff has been diagnosed as having a learning disorder or ADHD "does not automatically

mean that he is entitled to an accommodation under the ADA."  *Love v. Law Sch. Admission*

*Council*, 513 F. Supp.2d 206, 226 (E.D. Pa. 2007); *see also Lessard v. Osram Sylvania, Inc.*, 175

F.3d 193, 197 (1st Cir. 1999) ("Under the ADA, not all impairments lead to protection.  Only

those impairments which substantially limit a major life activity do so.") (internal citation

omitted).

### 2.     Major Life Activity

The ADA defines "major life activities" to include "learning, reading, concentrating,

[and] thinking."  42 U.S.C. § 12102.  NBME does not dispute that the Step 2 examinations for

which Densmore sought accommodations involve major life activities as defined by the ADA.

### 3.     Substantially Limits

The regulations adopted under the ADA establish the standard by which a legal disability

is measured:  "An impairment is a disability . . . if it substantially limits the ability of an

individual to perform a major life activity as compared to *most people in the general*

*population*."  28 C.F.R. § 36.105(d)(v) (emphasis added); *see also*, 29 C.F.R. § 1630.2(j)(1)(ii).

---

the proper meaning and interpretations of the definition of "disability."  *Amendment of Americans With Disabilities Act Title II and Title III Regulations To Implement ADA Amendments Act of 2008*, 81 Fed. Reg. 53204 (Aug. 11, 2016).  Prior to these new regulations, courts have followed 29 C.F.R. § 1630.2, which is part of the regulations issued to implement title I of the ADA, in interpreting "disability" under other titles of the ADA.  *See, e.g.*, *Caldarola v. Rosner Realty LLC*, No. 13-80493-CIV, 2014 WL 537398, at *3 (S.D. Fla. Feb. 11, 2014); *Fox v. Vitamin Cottage Natural Grocers*, No. 05-CV-00962-REB-PAC, 2006 WL 2308492, at *8 (D. Colo. Aug. 9, 2006); *Rush v. Nat'l Bd. of Med. Examiners*, 268 F. Supp.2d 673, 678 (N.D. Tex. 2003).  The definition of "mental impairment" is materially identical in both.  *Compare* 28 C.F.R. § 36.105(b)(1)(ii), 81 Fed. Reg. 53204, 53241 *with* 29 C.F.R. § 1630.2(h)(2).

[6] The regulations courts applied in title III cases prior to the new regulations are materially identical.  *Compare* 28 C.F.R. § 36.105(d)(v), 81. Fed. Reg. 53204, 53241 *with* 29 C.F.R. § 1630.2(j)(1)(ii).

In 2008, the ADA was amended for the purpose of "reinstating a broad scope of protection" available to individuals under the Act.  ADA Amendments Act of 2008, Pub. L. No. 110-325 § 2(b)(1) (2008).  The amendments, however, did not change the comparative basis for determining when an impairment constitutes a disability.

It is insufficient for a person requesting accommodations under the ADA to show that he or she is "substantially limited" in a major life activity based upon a comparison to others in his or her "academic peer group or, in the case of standardized tests, to other test-takers who are not representative of the general population."  *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*, No. CV 15-4987, 2016 WL 1404157, at *6, 8 (E.D. Pa. Apr. 11, 2016) (holding that defendant testing entity did not violate the ADA by denying accommodations to plaintiff, whose reading and processing abilities were average when compared to the general population that her test scores "were squarely within the average range for people in her age group").  *See also Singh v. George Washington Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097, 1100 (D.C. Cir. 2007) (comparison is "to the general population, rather than to persons of elite ability or unusual experience"); *Rumbin v. Ass'n of Am. Med. Colls.*, 803 F. Supp.2d 83, 93 (D. Conn. 2011) ("The relevant comparison is not with other test-takers or future doctors, but rather, with members of the general population."); 28 C.F.R. § 36.105(d)(3)(iii), 81 Fed. Reg. 53204, 53242 ("someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak or learn *compared to most people in the general population*") (emphasis added); *see also*, 29 C.F.R. § 1630.2(j)(4)(iii).

It is also insufficient for a person requesting accommodations under the ADA to show that he or she is "substantially limited" in a major life activity based upon a comparison to his or her own abilities.  *See Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp.2d 636, 651 (E.D. Pa. 2013), ("Court must compare [plaintiff's] test scores and test-taking ability against the general population and not against his own expected capabilities."), *aff'd*, 582 F. App'x 114 (3d Cir. 2014); *Bach v. Law Sch. Admission Council,* 2014 U.S. Dist. LEXIS 124632, *5 (M.D.N.C. 2014) ("[M]uch of [plaintiff's] evidence focuses on his low clinical test scores relative to his own intellect, not in comparison to the general population, tending to indicate that his ADHD does not substantially limit a major life activity.") (denying plaintiff examinee's motion for a preliminary injunction); *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp.2d 42, 46-47 (D. Mass. 2006) (denying preliminary injunction in part because plaintiff examinee was not likely to prevail in showing that her claimed learning disability and ADHD substantially limited any major life activity, and noting that, although there was "an apparent gap between the plaintiff's very high IQ scores and her actual performance on certain tasks," her overall "performance on the diagnostic testing was within the average range, sometimes low average, sometimes high, with occasional scores above and below the average range").

### B.    Densmore Has Only Been Diagnosed With A Mental Impairment When He Is Seeking Some Form Of Accommodation

In support of his requests for accommodations on the Step 2 exams in 2008, Densmore submitted materials from a 2008 evaluation by Dr. Libet.  He submitted the same evaluation from Dr. Libet when he requested accommodations in 2012, together with an evaluation by Lydia Katz, Ph.D.  Dr. Libet diagnosed Densmore as having reading, math and writing disorders. In contrast, Dr. Katz diagnosed Densmore only with ADHD and a reading disorder.  The evaluations leading to these diagnoses were conducted for the specific purpose of providing

documentation to Densmore that would support his request for accommodations on medical

school exams and, in particular, on the USMLE Step 2 exams.  These evaluations are

questionable because they were conducted for the specific purpose of obtaining accommodations

on medical school exams and in particular, on the USMLE Step 2 exams.

Densmore was first evaluated by Dr. Libet in May 2006 when he was 40 years old.

Dr. Libet reported that Densmore "self-referred and requested evaluation for learning

disability/disorder."  Dr. Libet's records indicate that the purpose of her 2006 testing was to

"evaluate … test taking performance in order to assist in preparing for [Densmore's] professional

licensure examination."[7]

Dr. Libet's notes from 2006 indicate that Densmore reported no "history of previous

academic problems or any mental health problems."  Her notes reflect that Densmore reported to

have been seen for "prescreening for Learning Disability and was found to have a 'profound

learning disability."  Yet he testified in his deposition that he had not seen any other healthcare

providers to deal with his alleged learning disorders.

Densmore tested in the Superior or Average range on nearly every diagnostic test given

by Dr. Libet.  Nevertheless, based on his reading rate on one test, and a comparison of his IQ

with his test results, Dr. Libet concluded that "slow reading might be interfering with his

academic achievement" and it would be "appropriate" to give him extra time on medical school

exams, a recommendation she provided.  Dr. Libet's diagnosis was "reading disorder" and "rule

out learning disorder NOS (e.g. Auditory Processing problem)."  She also recommended that he

have a "complete audiological examination."  There is no indication that Densmore followed up

---

[7] In 2006, Densmore was preparing to take the Step 1 USMLE exam.  He did not seek accommodation on that exam
and passed on the first attempt.

on that recommendation.  Dr. Libet did not recommend additional time on the USMLE or address that test in her 2006 report.

Dr. Libet began seeing Densmore for depression and academic problems in November 2006.  From that date until May 2007, she repeatedly diagnosed Densmore with a depressive disorder, a reading disorder, and a narcissistic personality disorder.  She also consistently recommended that he be "followed by his own physician [who she was unable to identify] for medications" for depression, and that he "continue individual therapy for depression" and to address "behavior patterns which continue to cause him problems in the professional setting." Densmore did not follow these recommendations.

Densmore sought an evaluation from Dr. Libet in February 2008 "for individual therapy relating to his upcoming Step 2 exam."  Her evaluation reflects that Densmore "requested this additional evaluation since he would like to seek accommodations for Step 2 of the USMLE," and that he needed achievement testing because the NBME required it.  During the testing, Densmore asked about the tasks on the tests and "how they related to his overall 'learning disorder.'"  The test results show that his oral, academic, reading, mathematics and written language skills were in the average range compared to "others at his grade level" and that his verbal language skills and comprehension and his ability to apply academic skills were superior. Although she had diagnosed Densmore with depression and a narcissistic personality disorder as recently as February 2008, Dr. Libet's 2008 evaluation now diagnosed him only with a reading disorder (based on prior testing) and with a mathematics disorder and a disorder of written expression.  She recommended that he receive extended time on the USMLE Step 2 exams. Densmore submitted Dr. Libet's 2008 evaluation with his 2008 request for accommodations and again when he requested accommodations on the Step 2 exams in late 2012 and early 2013.

In 2010, after moving to New Hampshire in 2008, Densmore was evaluated by Dr. Katz in Walpole, New Hampshire.  Dr. Katz noted he sought evaluation after failing the Step 2 exams "in order to document his need for additional time on the on Part II of the USMLE," and that her office "had extensive experience working with medical and professional school students who have required documented evidence for the need for various reasonable accommodations on professional level examinations."

Densmore reported to Dr. Katz that he "had no problems learning to read and did well in school until his middle school years when he lost interest in academics."  Dr. Katz concluded that Densmore is "currently functioning within a Superior range of cognitive ability overall," but that there was a "significant difference in his measured cognitive abilities when the task demands both working memory and psychomotor processing speed."  She diagnosed him not with any of the various disorders that Dr. Libet had diagnosed in 2008, but with "Attention-Deficit/ Hyperactivity Disorder.  Combined Type and a Reading Disorder."  Dr. Katz recommended that Densmore "would do well to work with a software cognitive mapping program….as a study tool," that he "may benefit from a trial of medication as an intervention to improve working memory functions that are part of his underlying attention deficit disorder" and that he "may benefit from a period of counseling in order to work on mental flexibility, negativity, and personal sensitivity issues."  Densmore did not follow any of those recommendations.

The only other evaluation of Densmore was done by his expert witness in this case, David Egerton, Ph.D., in November 2015.  According to Dr. Egerton, the evaluation was done to "provide data to the NBME pertinent to Denny's request for USMLE Step II accommodations."  Dr. Egerton attempted to answer questions about whether there were "indications of attentional deficits, … cognitive dysfunction….and …. emotional/behavioral concomitants" that impaired or

detracted from his ability to respond efficiently to questions on the USMLE.  Although

Dr. Egerton noted a "history of ADHD, depression and anxiety in Denny's family," no other

evaluation of Densmore reported such a history.  Dr. Egerton found that Densmore was taking

Escitalopram for depression and had a prescription for Adderall for ADHD, but in his deposition

Densmore denied that at the time of his evaluation by Dr. Egerton, he was taking or had a current

a prescription for Adderall.

      Dr. Egerton's evaluation contains a "Personality Assessment Inventory."  The Inventory

reports that Densmore "may not have answered in a completely forthright manner," and "tended

to portray himself in a consistently negative or pathological manner," thereby possibly

"distort[ing] the clinical picture" and "rais[ing] the possibility of an element of exaggeration of

complaints and problems" that should be considered when reviewing the report.  Yet nowhere in

his report does Dr. Egerton address this finding.

      Dr. Egerton did not conclude that Densmore is substantially impaired relative to most

people.  Instead, he focused only on whether he had a disability that affected his performance on

the USMLE.  Dr. Egerton concluded that he "believes" that Densmore "exhibit[s] symptoms" of

ADHD of a "sufficient magnitude to interfere with his information processing speed," that the

"data support the assertion" that this dysfunction would "interfere with his ability to [sic]

efficiently on a timed test," and that the results from the Personality Inventory "suggest that

Denny is dealing with emotional issues of a magnitude to interfere with efficient cognitive

processing."  He diagnosed Densmore with "Attention-Deficit/ Hyperactivity Disorder,

Predominantly, Inattentive Presentation" and "Rule Out…major Depressive Disorder (Recurrent

Unspecified."  Despite that conclusion, he made no attempt to assess whether the "emotional/

behavioral" issues or the "major depressive disorder" had an independent impact on his ability to perform on the USMLE.

### C.     Densmore Has Not Shown That He Has A Disability Under The ADA

Dr. Benjamin J. Lovett, Ph. D., who NBME will present as its expert witness, will testify that in his opinion, based on the information provided to the NBME by Densmore, it is doubtful that Densmore had any learning disorder or ADHD under the diagnostic criteria of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[8]  He will further testify that, based on this information, even if Densmore were impaired, this impairment did not substantially limit his major life activities compared to most people in the general population, as required to find a disability under the ADA.

#### 1.     Dr. Lovett's Qualifications

Dr. Lovett is an Assistant Professor in the Psychology Department at the State University of New York (SUNY) at Cortland, director of the SUNY Cortland Psycho-Educational Assessment Research Laboratory, and a licensed psychologist in the State of New York with a career-long focus on the assessment and diagnosis of learning and attention problems.  His doctoral dissertation focused on the factors affecting performance on timed tests.  He has served as the Coordinator of the ADHD Clinic at SUNY Upstate Medical University and has supervised master's theses and doctoral dissertations on learning disabilities, ADHD, and related issues at Syracuse University, where he has an adjunct appointment.  Most of Dr. Lovett's more than 60 published articles and book chapters deal with students with learning and attention problems, or on the provision of testing accommodations to such students.  Dr. Lovett provides consultation

---

[8]  The DSM-5 is "the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts…."  *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).  Published by the American Psychiatric Association, the DSM is "the authoritative reference used in diagnosing mental disorders."  *Young v. Murphy*, 615 F.3d 59, 61 (1st Cir. 2010).

services to a variety of educational institutions and testing agencies regarding disability

accommodations, including to the NBME.  He has reviewed the files of over 500 examinees

applying for testing accommodations since 2010.  Dr. Lovett, as an independent consultant for

NBME, reviewed Densmore's request for accommodations for the USMLE Step 2 exam in

January 2013.

2.  <u>The Evidence Will Show That Densmore Has Not Documented the
Existence of A Disability Under The ADA</u>

Dr. Lovett will testify that Densmore has provided insufficient evidence to support a

diagnosis of a reading disability, writing disability, math disability,[9] or ADHD under the DSM-

V, and that, even if he does have an impairment, he has not provided documentation establishing

that he is limited in the major life activities of reading and writing involved in taking the

USMLE Step 2 exams when compared with most people in the general population.

a.  <u>Densmore Does Not Have A Reading Disorder That Is A Disability Under
The ADA</u>

Dr. Lovett will testify that the evidence is insufficient to establish that Densmore has a

reading disorder under the DSM-5.  The DSM-5 criteria require that, in order to have a reading

disorder, a person have reading skills that are "substantially and quantifiably below those

expected for the individual's chronological age."  Yet when Densmore has completed diagnostic

tests comparing his readings skills to those in his age group, his performance has invariably been

in the average range or above, even when taken under timed conditions.  Further, Densmore has

taken several real-world, high-stakes timed examinations that require reading comprehension

without receiving accommodations and he scored in the average range:

---

[9] NBME will not address Densmore's claimed math disability, dyscalculia, as the examinees on the USMLE are
provided with a calculator to perform any needed calculations.  However, Dr. Lovett will testify that Densmore is
likely not impaired with respect to math given that he scored in the 60th percentile on the SAT math section and that
almost every time he has been compared to age peers on diagnostic tests, his mathematics scores have been in the
average range or above.

- On the ASVAB in 1986, Densmore scored at least average on the Word Knowledge and Paragraph Comprehension sections.

- On the SAT in 1990, he scored in the 54th percentile, better than a majority of college-bound high-school seniors.

- On the MCAT in 1996, Densmore scored slightly above average on the verbal reasoning section when compared to the high-performing, relative to the general population, group of medical school applicants.

- On the MCAT in 2002, Densmore scored in the average range.

Finally, Dr. Lovett will testify that one would expect to see a long history relating to reading troubles in someone who has a reading disability, including documented trouble learning to read.  Densmore has reported that he had no trouble learning how to read and his real-world, timed examination record shows that he has not been substantially impaired in reading.

Densmore's evaluators have generally attempted to justify a diagnosis that he has a reading disability by comparing his reading scores either to those of a particular academic group or to Densmore's own performance on intelligence tests.  Dr. Lovett will testify that these are invalid methods for diagnosing a learning disability in reading, per the diagnostic criteria in the DSM-5.  Furthermore, even if he were to have an impairment, it is precisely these types of comparisons that courts have found are not sufficient to establish that he is "substantially limited" in reading compared to *most people in the general population*, as required under the ADA.  *E.g.*, *Bibber*, 2016 WL 1404157, at *6, 8; *Rumbin*, 803 F. Supp.2d at 93.  Densmore has provided no evidence that he is substantially impaired in the activity of reading as compared to most people in the general population, and thus he is not entitled to an accommodation under the ADA.

b.     Densmore Does Not Have A Writing Disorder That Is A Disability Under The ADA

Dr. Lovett will testify that, as with a reading disability, a person must have writing skills that are "substantially and quantifiably below those expected for the individual's chronological age" in order to meet the diagnostic criteria under the DSM-V.  Densmore's writing scores, when compared to people of his own age group, are in at least the average range.  Further, of Densmore's four evaluations, the diagnosis of a writing disorder was made only once, in 2008.

c.     Densmore Does Not Have An Attention Disorder That Is A Disability Under The ADA

ADHD is a disorder involving very high levels of inattention and/or hyperactivity/impulsiveness where these symptoms (1) are present across multiple settings, (2) are present early in life, (3) cause significant problems for the person in real-world activities, and (4) are not better explained by a different disorder.  Dr. Lovett will testify that Densmore has presented insufficient evidence for a diagnosis of ADHD.

Dr. Lovett will testify that, even more so than with learning disabilities, ADHD is expected to cause problems in everyday life, real-world activities.  However, Densmore was diagnosed with ADHD for the first time in 2010, at age 44, for the specific purpose of obtaining accommodations on Step 2 of the USMLE.  There is no record of problems in his everyday life. As set forth in detail above, Densmore was in the Navy and Army National Guard for many years and worked for eight years for GE, receiving generally favorable reviews which noted his attention to detail and ability to complete tasks in a timely matter.  He took the SAT and received above-average scores—without accommodations, and then took the MCAT and received at least average scores—without accommodations—and was admitted to three medical schools. Dr. Lovett will further testify that based on information provided by Densmore himself it is questionable whether Densmore has meaningful levels of ADHD symptoms, as at least one of

- 26 -

his self-reports revealed unusually low levels of problems relating to "executive functioning" (*e.g.*, staying organized and planning ahead).  Finally, even if Densmore has ADHD, Dr. Lovett will testify that he is nevertheless not "substantially impaired" compared to the general population with respect to the major life activities of reading and writing (the major life activities needed to complete the USMLE Step 2), given his performance on real-world, timed examinations.  In short, Densmore's claimed ADHD does not qualify as a disability under the ADA, and therefore he does not need accommodations to make the USMLE Step 2 "accessible" to him under the ADA.  42 U.S.C. § 12189.

## CONCLUSION

The evidence at trial will show that Densmore has failed to document the existence of a disability under the ADA.  Based on his submissions to NBME, it is doubtful that Densmore has a mental impairment under the DSM-5.  However, even if he does have a mental impairment in the form of a reading disorder, writing disorder, or ADHD, the evidence will nevertheless show that he has not documented that he is substantially limited compared with the general population with respect to the major life activities of reading or writing needed to take the USMLE Step 2 examinations.

Judgment should be entered in favor of the Defendant NBME.

Respectfully submitted,

NATIONAL BOARD OF MEDICAL
EXAMINERS

Date:  September 29, 2016

By its attorneys,

MCLANE, GRAF, RAULERSON AND
MIDDLETON, PROFESSIONAL
ASSSOCIATION

By: /s/ Wilbur A. Glahn, III
     Wilbur A. Glahn, III, Bar No. 937
     Benjamin B. Folsom, Bar No. 268352
     900 Elm Street, P.O. Box 326
     Manchester, NH 03105
     Phone:  (603) 625-6464
     bill.glahn@mclane.com
     benjamin.folsom@mclane.com

Certificate of Service

I certify that, on September 29, 2016, I served the foregoing via ECF electronic transmission in accordance with the Court's Administrative Procedures for ECF to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants, if any.

/s/ Wilbur A. Glahn, III
Wilbur A. Glahn, III, Bar No. 937

11287740